IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| MATTHEW B. SALZBERG, JULIE M.B. BRADLEY, TRACY BRITT COOL, KENNETH A. FOX, ROBERT P. GOODMAN, GARY R. HIRSHBERG, BRIAN P. KELLEY, KATRINA LAKE, STEVEN ANDERSON, J. WILLIAM GURLEY, MARKA HANSEN, SHARON MCCOLLAM, ANTHONY WOOD, RAVI AHUJA, SHAWN CAROLAN, JEFFREY HASTINGS, ALAN HENDRICKS, NEIL HUNT, DANIEL LEFF, and RAY ROTHROCK, | § § No. 346, 2019 § § Court Below: Court of § Chancery of the State of §  Delaware § § C.A. No. 2017-0931 § § § § § § |
| Defendants Below, Appellants, | § § § |
| and | § § |
| BLUE APRON HOLDINGS, INC., STITCH FIX, INC., and ROKU, INC., | § § § |
| Nominal Defendants Below, Appellants, | § § § |
| v. | § § |
| MATTHEW SCIABACUCCHI, on behalf of himself and all others similarly situated, | § § § § § |
| Plaintiff Below, Appellee. | § § § § § § § |

Submitted: January 8, 2020
Decided:  March 18, 2020

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, and **TRAYNOR**, Justices; and **KARSNITZ**, Judge,* constituting the Court *en Banc*.

Upon appeal from the Court of Chancery.    **REVERSED**.

William B. Chandler, III, Esquire (*argued*), Bradley D. Sorrels, Esquire, Lindsay Kwoka Faccenda, Esquire, Andrew D. Berni, Esquire, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; Boris Feldman, Esquire, David J. Berger, Esquire, WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California; *Attorneys for Defendants-Appellants Katrina Lake, Steven Anderson, J. William Gurley, Marka Hansen, Sharon McCollam, Anthony Wood, Ravi Ahuja, Shawn Carolan, Jeffrey Hastings, Alan Hendricks, Neil Hunt, Daniel Leff, Ray Rothrock, Stitch Fix, Inc., and Roku, Inc.*

Catherine G. Dearlove, Esquire, Anthony M. Calvano, Esquire, Tyre Tindall, Esquire, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; Michael G. Bongiorno, Esquire, WILMER CUTLER PICKERING HALE & DORR, LLP, New York, New York; Timothy J. Perla, Esquire, WILMER CUTLER PICKERING HALE & DORR, LLP, Boston, Massachusetts; *Attorneys for Defendants-Appellants Matthew B. Salzberg, Julie M.B. Bradley, Tracy Britt Cool, Kenneth A. Fox, Robert P. Goodman, Gary R. Hirshberg, Brian P. Kelley, and Blue Apron Holdings, Inc.*

Kurt M. Heyman, Esquire, Melissa N. Donimirski, Esquire, Aaron M. Nelson, Esquire, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Jason M. Leviton, Esquire, Joel A. Fleming, Esquire (*argued*), Lauren Godles Milgroom, Esquire, Amanda R. Crawford, Esquire, BLOCK & LEVITON LLP, Boston, Massachusetts; *Attorneys for Plaintiff-Appellee Matthew Sciabacucchi.*

**VALIHURA**, Justice:

---

* Sitting by designation under Del. Const. Art. IV § 12.

2

We are asked to determine the validity of a provision in several Delaware corporations' charters requiring actions arising under the federal Securities Act of 1933 (the "Securities Act" or "1933 Act") to be filed in a federal court. Blue Apron Holdings, Inc., Roku, Inc., and Stitch Fix, Inc. are all Delaware corporations that launched initial public offerings in 2017. Before filing their registration statements with the United States Securities and Exchange Commission (the "SEC"), each company adopted a federal-forum provision. An example of such a federal-forum provision (or "FFP") provides:

> Unless the Company consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933. Any person or entity purchasing or otherwise acquiring any interest in any security of [the Company] shall be deemed to have notice of and consented to [this provision].[1]

Appellee Matthew Sciabacucchi ("Appellee") bought shares of each company in its initial public offering or a short time later. He then sought a declaratory judgment in the Court of Chancery that the FFPs are invalid under Delaware law. The Court of Chancery held that the FFPs are invalid because the "constitutive documents of a Delaware corporation cannot bind a plaintiff to a particular forum when the claim does not involve rights or relationships that were established by or under Delaware's corporate law."[2] Because such a provision can survive a facial challenge under our law, we **REVERSE**.

---

[1] *Sciabacucchi v. Salzberg*, 2018 WL 6719718, at *6 (Del. Ch. Dec. 19, 2018) [hereinafter *Opinion*]. Defendants Stitch Fix, Inc. and Roku, Inc. adopted substantively identical provisions, while Blue Apron, Inc. qualified its FFP to have effect "to the fullest extent permitted by law." *Id.; see* App. to Opening Br. at A69, A84, A100.

[2] *Opinion*, 2018 WL 6719718, at *3.

3

## I. Overview

The Securities Act of 1933 requires persons offering securities for sale to the public to file a registration statement[3] that makes "full and fair disclosure of relevant information."[4] The 1933 Act creates private rights of action so that purchasers of securities can enforce the registration and disclosure requirements of the 1933 Act.[5] Unlike some other securities laws for which there are no private rights of action, the statute provides that private plaintiffs may bring their claims under the 1933 Act in either federal or state courts.[6] The statute also bars the removal of such actions from state court to federal court.[7] Thus, if a plaintiff chooses to bring an action under the 1933 Act in state court, a defendant cannot change the forum.[8]

---

[3] 15 U.S.C. § 77e.

[4] *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1066 (2018) (internal quotation marks omitted).

[5] *Id; see also Omnicare, Inc. v. Laborers Dist. Counsel Constr. Indus. Pension Fund*, 575 U.S. 175, 179 (2015) ("The Securities Act of 1933 . . . protects investors by ensuring that companies issuing securities (known as 'issuers') make a 'full and fair disclosure of information' relevant to a public offering.").

[6] *Cyan*, 138 S. Ct. at 179; *see* 15 U.S.C. § 77v(a) ("The district courts of the United States and the United States courts of any Territory shall have jurisdiction of offenses and violations under this subchapter . . . and, concurrent with State and Territorial courts, except as provided in section 77p of this title with respect to covered class actions, of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter.").

[7] *See* 15 U.S.C. § 77v(a) ("Except as provided in section 77p(c) of this title, no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States."); *see also Cyan*, 138 S. Ct. at 1078 ("[The Securities Litigation Uniform Standards Act of 1998 ('SLUSA')] did nothing to strip state courts of their longstanding jurisdiction to adjudicate class actions alleging only 1933 Act violations. Neither did SLUSA authorize removing such suits from state to federal court.").

[8] *Cyan*, 138 S. Ct. at 1066.

Section 12(a)(1)[9] of the 1933 Act "imposes strict liability for violating" the securities registration requirements, which "are the heart of the Act."[10]  Section 11[11] "allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement."[12]  A plaintiff who purchased a security issued under a registration statement "need only show a material misstatement or omission to establish his *prima facie* case."[13]  In addition to the issuer, other defendants, including the corporation's directors,[14] are also potentially liable, although they may avoid liability by proving a due diligence defense.[15]

Section 12(a)(2)[16] "provides similar redress where the securities at issue were sold using prospectuses or oral communications that contain material misstatements or

---

[9] 15 U.S.C. § 77*l*(a)(1).

[10] *Pinter v. Dahl*, 486 U.S. 622, 638 (1988).

[11] 15 U.S.C. § 77k(a).

[12] *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983).

[13] *Id.* at 382 (citations omitted); *see also Omnicare*, 575 U.S. at 179 ("Section 11 thus creates two ways to hold issuers liable for the contents of a registration statement—one focusing on what the statement says and the other on what it leaves out.  Either way, the buyer need not prove (as he must to establish certain other securities offenses) that the defendant acted with any intent to deceive or defraud." (citation omitted)); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358–59 (2d Cir. 2010) (stating that, to state a claim under Section 11, a plaintiff must allege that "(1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading'" (quoting 15 U.S.C. § 77k(a))).

[14] *See* 15 U.S.C. § 77k(a)(1)–(5) (listing potential defendants).

[15] *Huddleston*, 459 U.S. at 382.

[16] 15 U.S.C. § 77*l*(a)(2).

omissions."[17]  Liability under Section 12(a)(2) extends to "statutory sellers," including a person who "passed title, or other interest in the security, to the buyer for value" or "successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner."[18]  Section 15 imposes liability on an individual or entity that "controls any person liable" under Sections 11 or 12.[19]

Concerns over "perceived abuses of the class-action vehicle in litigation involving nationally traded securities" prompted Congress to adopt the Private Securities Litigation Reform Act in 1995 ("PSLRA").[20]  The provisions of the PSLRA, aimed at the "Reduction of Abusive Litigation," "limit recoverable damages and attorney's fees, provide a 'safe harbor' for forward-looking statements, impose new restrictions on the selection of (and compensation awarded to) lead plaintiffs, mandate imposition of sanctions for frivolous litigation, and authorize a stay of discovery pending resolution of any motion to dismiss."[21]  But the PSLRA "had an unintended consequence:  It prompted at least some members of the plaintiffs' bar to avoid the federal forum altogether.  Rather than face the obstacles set in their path by the [PSLRA], plaintiffs and their representatives began bringing class actions under state law, often in state court."[22]

---

[17] *Morgan Stanley*, 592 F.3d at 359; *see* 15 U.S.C. §§ 77z–1, 78u–4.

[18] *Morgan Stanley*, 592 F.3d at 359 (internal quotations and alterations omitted).

[19] 15 U.S.C. § 77*o*(a).

[20] *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006).

[21] *Id.* (summarizing 15 U.S.C. § 78u–4).

[22] *Id.* at 82.

Some corporations preferred to litigate 1933 Act claims in federal court and began adopting forum-selection provisions that designated the federal courts as the exclusive forum for such claims.[23] Each of the companies in this appeal is a Delaware corporation that launched a 2017 initial public offering. Before filing their registration statements with the SEC, each company adopted a federal-forum provision in its certificate of incorporation, designating the federal courts as the exclusive forum for the resolution of claims under the 1933 Act.

Roku's and Stitch Fix's federal-forum provisions provided:

Unless the Company consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933. Any person or entity purchasing or otherwise acquiring any interest in any security of [the Company] shall be deemed to have notice of and consented to [this provision].[24]

Blue Apron's provision differed slightly:

Unless the Corporation consents in writing to the selection of an alternative forum, the federal district courts of the United States of America shall, *to the fullest extent permitted by law*, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933. Any person or entity purchasing or otherwise acquiring *or holding* any interest in *shares of capital stock* of the Corporation shall be deemed to have notice of and consented to [this provision].[25]

---

[23] *Opinion*, 2018 WL 6719718, at *6.

[24] App. to Opening Br. at A84, A100.

[25] *Id.* at A69 (emphasis added). The language difference between the two provisions is immaterial to our decision.

Appellee bought shares of common stock of each company, either in the initial public offering or a short time later. On December 29, 2017, he filed a putative class-action complaint in the Court of Chancery against the individuals who had served as the companies' directors since they went public, and named the companies as nominal defendants. The complaint sought a declaratory judgment that the federal-forum provisions are invalid under Delaware law.

The Court of Chancery granted the motion for summary judgment. In reaching that result, the court examined its 2013 decision in *Boilermakers Local 154 Retirement Fund v. Chevron Corp.*,[26] this Court's 2014 decision in *ATP Tour, Inc. v. Deutscher Tennis Bund*,[27] federal case law, and what the Court of Chancery described as "first principles" of Delaware corporate law. The court decided that the "constitutive documents of a Delaware corporation cannot bind a plaintiff to a particular forum when the claim does not involve rights or relationships that were established by or under Delaware's corporate law."[28] Because "the Federal Forum Provisions attempt to accomplish that feat," the court held that the federal-forum provisions are "ineffective and invalid."[29]

---

[26] 73 A.3d 934 (Del. Ch. 2013).

[27] 91 A.3d 554 (Del. 2014).

[28] *Opinion*, 2018 WL 6719718, at *3.

[29] *Id*.

## II. Standard of Review

This Court reviews the Court of Chancery's decision to grant summary judgment *de novo*.[30] A court may grant summary judgment only if, based on the undisputed material facts, the moving party is entitled to judgment as a matter of law.[31] There are no material facts in dispute in this appeal, and the issues on which we decide this appeal concern the interpretation of the statutes governing the permissible contents of a Delaware corporation's certificate of incorporation. Statutory interpretation is a question of law, which we review *de novo*.[32] The plaintiff must show that the federal-forum provisions do not address a proper subject matter of charter provisions under 8 *Del. C.* § 102(b)(1).

## III. Analysis

### A. FFPs are Valid as They Fall Within the Plain Text of Section 102(b)(1)

#### 1. This is a Facial Challenge

In asserting its facial challenge, the plaintiff must show that the charter provisions "cannot operate lawfully or equitably *under any circumstances*."[33] Plaintiffs must demonstrate that the charter provisions "do not address proper subject matters" as defined by statute, "and can never operate consistently with law."[34]

---

[30] *In re Krafft-Murphy Co., Inc.*, 82 A.3d 696, 702 (Del. 2013).

[31] *Id.*

[32] *Corvel Corp. v. Homeland Ins. Co. of N.Y.*, 112 A.3d 863, 868 (Del. 2015).

[33] *Cedarview Opportunities Master Fund, L.P. v. Spanish Broad. Sys., Inc.*, 2018 WL 4057012, at *20 (Del. Ch. Aug. 27, 2018) (quoting *Boilermakers*, 73 A.3d at 948) (internal quotation marks omitted).

[34] *Boilermakers*, 73 A.3d at 949 (citing *Stroud v. Grace*, 606 A.2d 75, 79 (Del. 1992) and *Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401, 407 (Del. 1985)).

9

## 2. *The FFPs Fall Within the Broad, Enabling Text of Section 102(b)(1)*

The analysis must begin with the text of Section 102, the provision of the Delaware General Corporation Law ("DGCL") governing the matters contained in a corporation's certificate of incorporation.[35] The "most important consideration for a court in interpreting a statute is the words the General Assembly used in writing it."[36] The court must "give the statutory words their commonly understood meanings."[37]

Section 102(b)(1) provides:

> (b) In addition to the matters required to be set forth in the certificate of incorporation by subsection (a) of this section, the certificate of incorporation may also contain any or all of the following matters: (1) Any provision for the management of the business and for the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, the directors, and the stockholders, or any class of the stockholders, or the governing body, members, or any class or group of members of a nonstock corporation; if such provisions are not contrary to the laws of this State. Any provision which is required or permitted by any section of this chapter to be stated in the bylaws may instead be stated in the certificate of incorporation . . . .[38]

Thus, Section 102(b)(1) authorizes two broad types of provisions:

> *any* provision for the management of the business and for the conduct of the affairs of the corporation,

---

[35] 8 *Del. C.* § 102. *See State v. Barnes*, 116 A.3d 883, 888 (Del. 2015) ("The starting point for the interpretation of a statute begins with the statute's language."); *Friends of H. Fletcher Brown Mansion v. City of Wilmington*, 34 A.3d 1055, 1059 (Del. 2011) ("[T]he meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms." (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)) (internal quotation marks omitted)).

[36] *Boilermakers*, 73 A.3d at 950 (citing *New Cingular Wireless PCS v. Sussex Cty. Bd. Of Adjustment*, 65 A.3d 607, 611 (Del. 2013)).

[37] *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 230 (Del. 1982).

[38] 8 *Del. C.* § 102(b)(1).

10

and

> *any* provision creating, defining, limiting and regulating the powers of the corporation, the directors, and the stockholders, or any class of the stockholders, . . . if such provisions are not contrary to the laws of this State.

An FFP could easily fall within either of these broad categories, and thus, is facially valid. FFPs involve a type of securities claim related to the management of litigation arising out of the Board's disclosures to current and prospective stockholders in connection with an IPO or secondary offering. The drafting, reviewing, and filing of registration statements by a corporation and its directors is an important aspect of a corporation's management of its business and affairs and of its relationship with its stockholders. This Court has viewed the overlap of federal and state law in the disclosure area as "historic," "compatible," and "complimentary."[39] Accordingly, a bylaw that seeks to regulate the forum in which such "intra-corporate" litigation can occur is a provision that addresses the "management of the business" and the "conduct of the affairs of the corporation," and is, thus, facially valid under Section 102(b)(1).

### i.  FFPs and Post-Cyan *Efficiencies*

To elaborate, FFPs can provide a corporation with certain efficiencies in managing the procedural aspects of securities litigation following the United States Supreme Court's decision in *Cyan, Inc. v. Beaver County Employees Retirement Fund.*[40] There, the United

---

[39] *Malone v. Brincat*, 722 A.2d 5, 13 (Del. 1998); *see id.* at 12 ("When corporate directors impart information they must comport with the obligations imposed by both the Delaware law and the federal statutes and regulations of the [SEC]."); *id.* at 13 (observing that, "[t]he historic roles played by state and federal law in regulating corporate disclosures have been not only compatible but complimentary" (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 474–80 (1977))).

[40] 138 S. Ct. 1061.

States Supreme Court unanimously held that federal and state courts have concurrent jurisdiction over class actions based on claims brought under the 1933 Act, and that such claims are not removable to federal court. Following *Cyan*, in 2018, the filing of 1933 Act cases in state courts escalated. The 2018 Year in Review Report by Cornerstone Research found that, "[t]here were 55 percent more state-only filings than federal-only filings in 2018."[41] Claims brought under Section 11 of the 1933 Act "decreased in federal courts as a portion of filing activity moved to state courts."[42] The 2018 report observed that, "[t]he uptick in state actions following the *Cyan* decision indicates a change in approach by plaintiffs."[43]

The recently released Cornerstone 2019 Year in Review Report states that, "[t]he number of state 1933 Act filings in 2019 increased by 40 percent from 2018," and that "[a]bout 45 percent of all state 1933 Act filings in 2019 had a parallel action in federal court."[44] In 2019, the combined number of federal Section 11 filings and state 1933 Act

---

[41] Stanford Law Sch. Secs. Class Action Clearinghouse & Cornerstone Research, *Securities Class Action Filings 2018 Year in Review* 22 (2019). The report notes that in 2018, the combined number of federal Section 11 filings and state 1933 Act filings was 41. This consisted of 13 parallel filings, 17 state-only filings, and 11 federal-only filings. Further, "these filings in federal and state courts increased by 52 percent compared to 2017 due to the rise in state filing activity." *Id.* at 21. In 2018, 16 class actions alleging 1933 Act violations were filed in California state courts, 13 were filed in New York state courts, and four were filed in other state courts. The 2018 Report concludes that, "[f]ilings in New York state courts appear to have markedly increased in 2018 as a result of the *Cyan* decision," and that, "[a]ll 13 1933 Act filings in New York were filed after the U.S. Supreme Court's ruling in March." *Id.* at 19.

[42] *Id.* at 10.

[43] *Id.* at 21.

[44] Stanford Law Sch. Secs. Class Action Clearinghouse & Cornerstone Research, *Securities Class Action Filings 2019 Year in Review* 4 (2020). The report notes that 1933 Act filings in California state courts decreased from 2018 to 2019, but filings in New York and other states rose

12

filings was 65, approximately a 59 percent overall increase from 2018.[45]  Of the 65 filings,

22 were parallel filings, 27 were state-only filings (a 69 percent increase from 2018), and

16 were federal-only filings.[46]  State-only and parallel filings made up over 75 percent of

all federal Section 11 and state 1933 Act filings in 2019.[47]  Since *Cyan*, 43 parallel class

actions have been filed in multiple jurisdictions.[48]  The 2019 report observes that, "[t]he 65

filings in 2019 was historically unprecedented," and that, "[p]rior to 2015, there were only

a handful of state court filings, and the highest number of federal Section 11 filings

previously was 57 in 1998."[49]

When parallel state and federal actions are filed, no procedural mechanism is

available to consolidate or coordinate multiple suits in state and federal court.  The costs

and inefficiencies of multiple cases being litigated simultaneously in both state and federal

courts are obvious.[50]  The possibility of inconsistent judgments and rulings on other

matters, such as stays of discovery, also exists.  By directing 1933 Act claims to federal

courts when coordination and consolidation are possible, FFPs classically fit the definition

of a provision "for the management of the business and for the conduct of the affairs of the

---

substantially, with New York state courts becoming the preferred state venue for 1933 Act plaintiffs.  *Id.*

[45] *Id.* at 22.

[46] *Id.* at 25.

[47] *Id.*

[48] *Id.* at 24.

[49] *Id.* at 25.

[50] The 2019 report notes "as an example of post-*Cyan* jurisdictional complexities," that in 2019, SmileDirectClub was the subject of securities class action filings in New York federal court, Tennessee federal and state courts, and Michigan federal and state courts.  *Id.* at 24.

corporation." An FFP would also be a provision "defining, limiting and regulating the powers of the corporation, the directors and the stockholders," since FFPs prescribe where current and former stockholders can bring Section 11 claims against the corporation its and directors and officers.[51]

### ii. FFPs are Not Contrary to Policies or Laws of Delaware

### a. FFPs Do Not Violate Section 102

Section 102(b)'s broad authorization is constrained by the phrase, "if such provisions are not contrary to the laws of this State."[52] FFPs do not violate the policies or laws of this State.

First, Section 102(b)(1)'s scope is broadly enabling. For example, in *Sterling v. Mayflower Hotel Corp.*,[53] this Court held that Section 102(b)(1) bars only charter provisions that would "achieve a result forbidden by settled rules of public policy."[54] Accordingly, "the stockholders of a Delaware corporation may by contract embody in the [certificate of incorporation] a provision departing from the rules of the common law, provided that it does not transgress a statutory enactment or a public policy settled by the common law or implicit in the General Corporation Law itself."[55]

---

[51] In *Boilermakers*, the Court of Chancery held that as "a matter of easy linguistics," the forum bylaws were valid under Section 109(b) "because they regulate *where* stockholders may file suit." 73 A.3d at 950–52. They also "plainly relate to the 'business of the corporation[s],' the 'conduct of [their] affairs,' and regulate the 'rights and powers of [their] stockholders.'" *Id.* at 939.

[52] 8 *Del. C.* § 102(b)(1).

[53] 93 A.2d 107 (Del. 1952).

[54] *Id.* at 118.

[55] *Id.* There are a few statutory provisions that cannot be limited in a certification of incorporation. *See* Edward P. Welch & Robert S. Saunders, *Freedom and Its Limits in the Delaware General*

Further, recognizing that corporate charters are contracts among a corporation's stockholders, stockholder-approved charter amendments are given great respect under our law. In *Williams v. Geier*,[56] in commenting on the "broad policies underlying the Delaware General Corporation Law," this Court observed that, "all amendments to certificates of incorporation and mergers require stockholder action," and that, "Delaware's legislative policy is to look to the will of the stockholders in these areas."[57] *Williams* supports the view that FFPs in stockholder-approved charter amendments should be respected as a matter of policy.[58] At a minimum, they should not be deemed violative of Delaware's public policy.

Finally, the DGCL allows immense freedom for businesses to adopt the most appropriate terms for the organization, finance, and governance of their enterprise.[59] "At its core, the [DGCL] is a broad enabling act which leaves latitude for substantial private ordering, provided the statutory parameters and judicially imposed principles of fiduciary duty are honored."[60] In fact, "Delaware's corporate statute is widely regarded as the most flexible in the nation because it leaves the parties to the corporate contract (managers and

---

*Corporation Law*, 33 Del. J. Corp. L. 845, 856–60 (2008) (discussing cases concerning the rights of stockholders to periodically elect directors, to inspect books and records, and directors' duty of loyalty).

[56] 671 A.2d 1368 (Del. 1996).

[57] *Id.* at 1381.

[58] *See Nat'l Indus. Grp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 387 (Del. 2013) ("The enforcement of an international forum selection clause is not an issue of comity. It is a matter of contract enforcement and giving effect to substantive rights that the parties have agreed upon.").

[59] Welch & Saunders, *supra* note 55, at 847.

[60] *Williams*, 671 A.2d at 1381.

stockholders) with great leeway to structure their relations, subject to relatively loose statutory constraints and to the policing of director misconduct through equitable review."[61]

In sum, FFPs are facially valid under both the enabling text of Section 102(b)(1) and as a matter of Delaware public policy.

> ### b. The 2015 Amendments Did Not Alter Section 102(b)(1)'s Broad Scope

Section 115, added in the 2015 amendments to the DGCL, supports the view that FFPs are valid under Delaware law, and in particular, Section 102(b)(1). Section 115 provides:

> The certificate of incorporation or the bylaws may require, consistent with applicable jurisdictional requirements, that any or all internal corporate claims shall be brought solely and exclusively in any or all of the courts in this State, and no provision of the certificate of incorporation or the bylaws may prohibit bringing such claims in the courts of this State. "Internal corporate claims" means claims, including claims in the right of the corporation, (i) that are based upon a violation of a duty by a current or former director or officer or stockholder in such capacity, or (ii) as to which this title confers jurisdiction upon the Court of Chancery.[62]

---

[61] *Jones Apparel Grp., Inc. v. Maxwell Shoe Co., Inc.*, 883 A.2d 837, 845 (Del. Ch. 2004).

[62] 8 *Del. C.* § 115. A similar provision was adopted in 2000 in the alternative entity context in response to this Court's decision in *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286 (Del. 1999). In that case, this Court upheld a forum-selection clause in the company's operating agreement which designated a foreign jurisdiction as the exclusive jurisdiction for internal disputes. In response, our General Assembly adopted Section 18-109(d) of the Delaware LLC Act prohibiting a Delaware LLC from designating a foreign jurisdiction as its exclusive jurisdiction for internal disputes. The Delaware Limited Partnership Act was similarly amended.

The 2015 amendments were intended, in part, to codify *Boilermakers*,[63] and to preclude a charter or bylaw provision from excluding Delaware as a forum for internal corporate claims. Notably, Section 102(b)(1) was not amended. The synopsis to the bill introducing the legislation states that, "Section 115 is also not intended to authorize a provision that purports to foreclose suit in a federal court based on federal jurisdiction, nor is Section 115 intended to limit or expand the jurisdiction of the Court of Chancery or the Superior Court."[64] FFPs do not foreclose suits in federal court. Rather, they direct 1933 Act claims (federal claims) to federal court.

The 2015 amendment adding Section 102(f) further supports the view that Section 102(b)(1) remains expansive enough to include FFPs. Section 102(f) prohibits fee-shifting as against stockholders (of stock corporations) in connection with an "internal corporate claim," as defined in Section 115. Specifically, Section 102(f) provides:

> (f) The certificate of incorporation may not contain any provision that would impose liability on a stockholder for the attorneys' fees or expenses of the corporation or any other party in connection with an internal corporate claim, as defined in § 115 of this title.[65]

The language in Section 102(f) implies that Section 102(b)(1) can address claims other than "internal corporate claims." Otherwise, the reference to "internal corporate claims"

---

[63] 73 A.3d 934.

[64] Del. S.B. 75 syn., 148th Gen. Assem. (2015).

[65] 8 *Del. C.* § 102(f). The 2015 amendments do not disturb the ruling in *ATP Tour Inc. v. Deutscher Tennis Bund*, 91 A.3d 554 (Del. 2014), in relation to nonstock corporations. Del. S.B. 75 syn. The synopsis also states that, "[n]ew subsection (f) is not intended, however, to prevent the application of such provisions pursuant to a stockholders agreement or other writing signed by the stockholder against whom the provision is to be enforced." *Id.*

17

in new Section 102(f) would not have been necessary. We must give meaning to every word in the statute.[66] Each part or section of a statute should be construed in connection with every other part or section to produce a harmonious whole.[67] "Statutory construction . . . is a holistic endeavor."[68] It is presumed that "the General Assembly purposefully chose particular language and [we] therefore construe statutes to avoid surplusage if reasonably possible."[69] This reading is also consistent with our holding in *ATP*.

The Appellee contends the 2015 amendments adding Section 115 *implicitly* amended Section 102(b)(1). More specifically, the Appellee contends that Section 115 "reflects either prohibition [of FFPs] or implicit recognition that [FFPs] were never

---

[66] *Doroshow, Pasquale, Krawitz & Bhaya v. Nanticoke Mem. Hosp., Inc.*, 36 A.3d 336, 344 (Del. 2012) (affirming the "canon of statutory construction that every word chosen by the legislature (and often bargained for by interested constituent groups) must have meaning").

[67] *Grimes v. Alteon Inc.*, 804 A.2d 256, 265 n.35 (Del. 2002) (*en banc*) (citing 2A Norman J. Singer, *Sutherland on Statutory Construction* § 46:05 (2000)).

[68] *Terex Corp. v. S. Track & Pump, Inc.*, 117 A.3d 537, 543 (Del. 2015); *see also Spielberg v. State*, 558 A.2d 291, 293 (Del. 1989) (stating that, statutes "must be viewed as a whole").

[69] *Sussex Cty. Dep't of Elections v. Sussex Cty. Republican Comm.*, 58 A.3d 418, 422 (Del. 2013) (citing *CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del. 2011)); *see Clark v. State*, 65 A.3d 571, 578 (Del. 2013); *Zhurbin v. State*, 104 A.3d 108, 110 (Del. 2014); *Chase Alexa, LLC v. Kent Cty. Levy Ct.*, 991 A.2d 1148, 1152 (Del. 2010) ("[W]ords in a statute should not be construed as surplusage if there is a reasonable construction which will give them meaning, and courts must ascribe a purpose to the use of statutory language, if reasonably possible." (quoting *Oceanport Indus., Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994)) (internal quotation marks omitted)). "The legislative body is presumed to have inserted every provision for some useful purpose and construction, and when different terms are used in various parts of a statute it is reasonable to assume that a distinction between the terms was intended." *Giuricich v. Emtrol Corp.*, 449 A.2d 232, 238 (Del. 1982) (citation omitted). *See Leatherbury v. Greenspun*, 939 A.2d 1284, 1291 (Del. 2007) (stating that, "[i]t is well established that a court may not engraft upon a statute language which has clearly been excluded therefrom," and that, "when provisions are expressly included in one statute but omitted from another, we must conclude that the General Assembly intended to make those omissions").

18

authorized by Section 102(b)(1) in the first place."[70] The Appellants disagree, arguing that because Section 115 does not explicitly state that a charter may not contain a forum-selection provision that addresses claims other than "internal corporate claims," Section 115 does not limit the scope of provisions that are permissible under Section 102(b)(1).[71]

The Appellee's argument runs afoul of a number of well-established principles of statutory construction. First, "[c]ourts do not resort to other statutes if the statute being construed is clear and unambiguous."[72] Section 102(b)(1) is clear and unambiguous. By its terms, it does not incorporate Section 115.

Second, principles of statutory construction instruct that statutes should not be superseded or altered by implication unless there is an irreconcilable conflict.[73] The Appellee attempts to create a conflict between Section 102(b)(1) and Section 115 by reading Section 115 as modifying Section 102(b)(1). But the two statutes do not conflict—at least not irreconcilably. Indeed, an interpretation that harmonizes the two—as opposed to one that puts them in conflict with each other—is readily available here. Section 115

---

[70] Answering Br. at 18.

[71] Opening Br. at 24; Reply Br. at 8–11.

[72] 2A Norman J. Singer, *Sutherland Statutory Construction* § 51:1 (7th ed.).

[73] "It is assumed that when the General Assembly enacts a later statute in an area covered by a prior statute, it has in mind the prior statute and therefore statutes on the same subject must be construed together so that effect is given to every provision unless there is an irreconcilable conflict between the statutes, in which case the later supersedes the earlier." *State v. Fletcher*, 974 A.2d 188, 193 (Del. 2009) (quoting *State, Dept. of Labor v. Minner*, 448 A.2d 227, 229 (Del. 1982)); *State v. Cook*, 600 A.2d 352, 355 (Del. 1991); *State ex. rel. Green v. Foote*, 168 A. 245, 247 (Del. 1933) ("When there are two Acts on the same subject the rule is to give effect to both if possible. But if the two are repugnant in any of their provisions, the later Act, without any repealing clause, operates to the extent of the repugnancy as a repeal of the first.").

simply clarifies that *for certain claims*, Delaware courts may be the only forum, but they cannot be excluded as a forum. Section 102(b)(1)'s general and broad provisions govern all other claims. Thus, Section 115 is not properly viewed as modifying Section 102(b)(1).

Instead, Section 115 merely confirms affirmatively, as held in *Boilermakers*, that a charter may specify that internal corporate claims must be brought in "the courts in this State" (presumably, including the federal court),[74] while prohibiting provisions that would preclude bringing internal corporate claims "in the courts of this State." Section 115, read fairly, does not address the propriety of forum-selection provisions applicable to other types of claims. If a forum-selection provision purports to govern intra-corporate litigation of claims that do not fall within the definition of "internal corporate claims," we must look elsewhere (back to Section 102(b)(1)) to determine whether the provision is permissible. This is because intra-corporate litigation relates to the business of the corporation (*see ATP*), and such provision is authorized under Delaware law and is facially valid.

The Appellee's "implicit prohibition" also fails to account for the fact that, when the General Assembly enacted the 2015 amendments, it included explicit prohibitions against fee-shifting (*see* Section 102(f)) and forum-selection provisions that precluded litigation of internal corporate claims in Delaware state courts. The Appellee does not

---

[74] "New Section 115 confirms, as held in *Boilermakers Local 154 Retirement Fund v. Chevron Corporation*, 73 A.3d 934 (Del. Ch. 2013), that the certificate of incorporation and bylaws of the corporation may effectively specify, consistent with applicable jurisdictional requirements, that claims arising under the DGCL, including claims of breach of fiduciary duty by current or former directors or officers or controlling stockholders of the corporation, or persons who aid and abet such a breach, must be brought only in the courts (including the federal court) in this State." Del. S.B. 75 syn.

20

explain why the General Assembly, having explicitly prohibited certain provisions, did not do so as to others—*i.e.*, forum-selection provisions governing claims that are not internal corporate claims—if that is what it intended to do. Had the General Assembly intended for Section 115 to circumscribe the scope of Section 102(b)(1), it would have amended that subsection in the 2015 amendments as well. Prohibiting fee-shifting provisions for internal corporate claims in the new subsection (f) of Section 102, while leaving Section 102(b)(1) untouched, does not indicate that the General Assembly intended to impliedly amend Section 102(b)(1) to restrict its scope. Rather, it signals that the General Assembly intended to leave the scope of Section 102(b)(1) intact. Courts do not impliedly amend or supersede other statutes unless that intention is "manifestly clear."[75]

Moreover, the synopsis of Section 115 suggests that Section 115 did not impliedly amend Section 102(b)(1). The synopsis states, among other things, that "Section 115 does not address the validity of a provision of the certificate of incorporation or bylaws that selects a forum other than the Delaware courts as an additional forum in which internal corporate claims may be brought."[76] Although this caveat is tethered to internal corporate claims, the Appellee's reasoning (that a forum-selection provision not expressly permitted by Section 115, is implicitly prohibited) runs head-first into it. After all, if, Section 115's permissive provision defines the whole universe of permitted forum-selection provisions,

---

[75] *Foote*, 168 A. at 247 ("Whether such statutes repeal the previously existing law, in the absence of a repeal in express terms, depends upon the presence or absence of an irreconcilable inconsistency between them, unless it is manifestly clear that the later enactment is intended to supersede the earlier law and embrace the whole subject-matter.").

[76] Del. S.B. 75 syn.; *see* R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporation & Business Organizations, Statutory Deskbook* 114-M (2017 ed.).

21

the synopsis's clarification that provisions allowing "Delaware plus another" jurisdiction should be written directly in the statute's text. Without that direct permission, the *expressio unius* doctrine should cause Section 115 to prohibit such "Delaware plus another" provisions.[77]

Finally, the Appellee's analogy between Section 115 and 102(b)(7) is a faulty one.[78] These amendments differ in that, before the amendment of Section 102(b)(7), the default under our common law was that such provisions were impermissible. The opposite is true with respect to forum-selection provisions, which, prior to Section 115, were valid under Section 102(b) and Section 109(b). It is logical for the express language of a permissive statute like Section 102(b)(7) to designate the outer bounds of its scope if it were impermissible initially. That is not the case with Section 115. Forum provisions were valid prior to Section 115's enactment.

---

[77] The *expressio unius est exclusio alterius* doctrine ("*expressio unius*" for short) is "[a] canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative." *Expressio unius est exclusion alterius*, Black's Law Dictionary (11th ed. 2019). However, it "properly applies only when the *unius* (or technically *unum*, the thing specified) can reasonably be thought to be the expression of *all* that shares in the grant or prohibition involved. Common sense often suggests when this is or is not so." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012); *see also* William N. Eskridge, Jr. *Interpreting Law: A Primer on How to Read Statutes and the Constitution* 408 (2016) (stating that, the *expressio unius* canon is "[i]napplicable if statutory purpose or context suggests listing is not comprehensive"). Section 115 merely confirms, as held in *Boilermakers*, that charters and bylaws may effectively specify that internal corporate claims must be brought in "the courts in this State." 2A Norman J. Singer, *Sutherland Statutory Construction* § 47:23 (7th ed.) ("[*E]xpressio unius* is a rule of statutory construction and . . . is subordinate to the primary rule that legislative intent governs the interpretation of a statute . . . .").

[78] *See* Answering Br. at 18–19 (arguing that, "Section 102(b)(7)'s express prohibition of some exculpatory provisions . . . could be read to implicitly authorize any exculpatory provision not expressly forbidden.").

Read holistically, Section 115 indicates a concern for centering particular claims—"internal corporate claims"—in Delaware. This makes sense given Delaware's interest and expertise in corporate law. As Section 11 claims are not "internal corporate claims," Section 115 does not apply.[79] In sum, FFPs, which direct Section 11 claims to federal courts (which are most experienced in adjudicating them), do not violate Section 115 and are facially valid.

## B. Section 102(b)(1) is Not Limited to "Internal Affairs" Matters

We disagree with the trial court's analysis in a number of respects. Among them, the Court of Chancery appears to have narrowed the broad enabling scope of Section 102(b)(1) in a way that is inconsistent with decisions by this Court and with the overall statutory scheme in Title 8.

### 1. ATP Suggests FFPs are Permissible Under Section 102(b)(1)

FFPs involve intra-corporate claims. *ATP* concerned intra-corporate claims.[80] *ATP* supports the view that FFPs can fall within Section 102(b)(1) and be deemed facially valid.

In *ATP*, this Court considered certified questions regarding fee-shifting provisions in the bylaws of a non-stock corporation. The plaintiffs were members of the defendant ATP, a Delaware membership corporation that operated a global professional tennis tour.

---

[79] Neither side in this case argues that Section 115's definition of "internal corporate claims" encompasses Section 11 claims. We think Section 115 likely was intended to address claims requiring the application of Delaware corporate law as opposed to federal law. Stated differently, we do not think the General Assembly intended to encompass federal claims within the definition of internal corporate claims. Thus, Section 115 is not implicated. And the fact that Section 102(b)(1) was not amended indicates that it remains broad enough to address other than internal corporate claims.

[80] 91 A.3d 554.

23

ATP amended its bylaws in 2006 to include a fee-shifting provision. The provision applied to any claim asserted by a member against the corporation whereby the member was required to reimburse the corporation for legal fees and costs incurred in connection with litigating the claim if the member did not obtain a judgment on the merits that substantially achieved, in substance and amount, the full remedy sought. Thus, the ATP bylaw "applie[d] in the event that a member brings a claim against another member, a member sues the corporation, or the corporation sues a member."[81] We referred to this scenario as "intra-corporate litigation."[82]

In 2007, ATP changed the tour schedule in a manner adverse to the plaintiff members. The members sued ATP based on federal antitrust, Delaware fiduciary duty, and other grounds. Specifically, the plaintiffs asserted that ATP and its Board violated sections 1 and 2 of the Sherman Act (Counts I–IV of the complaint), breached their fiduciary duties (Counts V–VII), tortiously interfered with the plaintiffs' contractual and business interests (Count VIII), and converted membership rights (Count IX). After trial, ATP prevailed on all claims.[83] Citing the fee-shifting bylaw, it then sought to recover its litigation fees and costs. The District Court denied ATP's motion, concluding that Article 23.3(a), the fee-shifting bylaw, was contrary to the policy underlying the federal antitrust

---

[81] *Id.* at 557; *see id.* at 559.

[82] *See id.* at 557, 558.

[83] The District Court granted judgment as a matter of law to ATP and the individual defendants on all of the state law counts, and to the individual defendants on the antitrust claims. A jury found ATP not liable for any antitrust violations. The Third Circuit affirmed the judgment. *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820 (3d Cir. 2010), *cert. denied*, 562 U.S. 1064 (2010).

laws.[84] It reasoned that federal law preempts the enforcement of fee-shifting agreements where antitrust claims are involved.

ATP appealed to the United States Court of Appeals for the Third Circuit. The Third Circuit vacated the District Court's order, and held that the District Court should have decided whether Article 23.3(a) was enforceable as a matter of Delaware law before addressing the federal preemption question.

After finding that the enforceability of the fee-shifting bylaw presented a novel question of Delaware law, the District Court certified four questions of law to the Delaware Supreme Court. The first question, relevant here, asked:

> May the Board of a Delaware non-stock corporation lawfully adopt a bylaw (i) that applies in the event that a member brings a claim against another member, a member sues the corporation, or the corporation sues a member (ii) pursuant to which the claimant is obligated to pay for "all fees, costs, and expenses of every kind and description (including, but not limited to, all reasonable attorneys' fees and other litigation expenses)" of the party against which the claim is made in the event that the claimant "does not obtain a judgment on the merits that substantially achieves, in substance and amount, the full remedy sought"?[85]

Responding to this question, this Court held as follows:

> A fee-shifting bylaw, like the one described in the first certified question, is facially valid. Neither the DGCL nor any other Delaware statute forbids the enactment of fee-shifting bylaws. A bylaw that allocates risk among parties in *intra-corporate litigation* would also appear to satisfy the DGCL's requirement that bylaws must "relat[e] to the business of the corporation, the

---

[84] *Deutscher Tennis Bund v. ATP Tour, Inc.*, 2009 WL 3367041, at *4 (D. Del. Oct. 19, 2009), *vacated*, 480 Fed. Appx. 124 (3d Cir. 2012). The District Court relied primarily on the Third Circuit's decision in *Byram Concretanks, Inc. v. Warren Concrete Prods. Co. of N.J.*, 374 F.2d 649, 651 (3d Cir. 1967), which held that, "in the absence of specific legislative authorization[,] attorneys' fees may not be awarded to defendants in private anti-trust litigation." Accordingly, the District Court refused to give effect to Article 23.3.

[85] *ATP*, 91 A.3d at 557.

conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees." The corporate charter could permit fee-shifting provisions, either explicitly or implicitly by silence. Moreover, no principle of common law prohibits directors from enacting fee-shifting bylaws.[86]

This Court held that the fee-shifting bylaw fell within both broad prongs of Section 102(b)(1)—namely, that it relates (i) to the "business of the corporation" and the "conduct of its affairs," and (ii) to the powers of the corporation or "the rights or powers of its stockholders, directors, officers or employees."[87]

The Court of Chancery suggests that since this Court was dealing with a facial challenge in *ATP*, so long as the claims involved a state law breach of fiduciary duty claim, that was enough for the bylaw in *ATP* to survive a facial challenge. It then states that our Court in *ATP* "did not suggest that the corporate contract can be used to regulate other types of claims."[88] We disagree with these points for at least three reasons. First, *ATP* held that the fee-shifting bylaw fell within the scope of Section 109(b) and 102(b)(1). It did not purport to define the outer limits of either Section 109(b) or 102(b)(1). Similarly, *Boilermakers* only held that the forum-selection bylaw (which addressed only internal affairs)[89] easily fell within Section 109(b). Contrary to what the Court of Chancery

---

[86] *Id.* at 558 (emphasis added).

[87] *Id.*

[88] *Opinion*, 2018 WL 6719718, at *13.

[89] The bylaw provision in *Boilermakers* provided:

Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the

26

suggests, *Boilermakers* did not establish the outer limit of what is permissible under either Section 109(b) or Section 102(b)(1). Second, not even Appellants are contending that Section 11 claims are "internal affairs" claims,[90] because Section 11 claims are not governed by substantive Delaware law. Rather, they are governed by federal law. But Section 11 claims are often asserted along with parallel state fiduciary duty and disclosure

---

> Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the Delaware General Corporation Law, or (iv) any action asserting a claim governed by the internal affairs doctrine. Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this [bylaw].

*Boilermakers*, 73 A.3d at 942. Although prong (iv) of this bylaw refers explicitly to "internal affairs," the Court of Chancery appropriately observed that all four prongs concern internal affairs. *Id.*

[90] During the oral argument before this Court, the following exchange occurred:

> Justice Valihura: Are you arguing then, that these provisions are not within the internal affairs doctrine as say articulated by *Edgar v. MITE*? And I think there the U.S. Supreme Court said "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders" and I think this Court used a similar description in the *VantagePoint* case.

> Mr. Chandler: You did. You did, a very similar description. My argument Your Honor, our argument, is that these provisions are intra-corporate claims. They touch upon the very same kind of internal relationships and conduct that the internal affairs doctrine, the difference is, there's only one difference. Even though the claim is internal in the same sense as an internal affairs claim, it doesn't arise under the same law. It arises under federal law. That's the only difference. Otherwise, it's the same relationships involved, boardroom conduct, stockholder status as a stockholder. That's the same thing as it is in an internal affairs claim, but it's not the same because it arises under a different law. And our point is a simple one, just because it arises under federal law, doesn't mean that it is now an external claim. That suddenly translates into an external claim, no it doesn't. Because it involves the same intra-corporate conduct as an internal affairs claim does. So they're the same. And that's why they can be treated under our law the same and the forum selection-provision can be applied to them. Just as this one, these three do.

Oral Argument Video at 21:55–23:22, https://livestream.com/DelawareSupremeCourt/events/8952021/videos/200564724.

claims and very often involve the same or similar predicate facts and defenses.[91]  As such, Section 11 claims are "internal" in the sense that they arise from internal corporate conduct on the part of the Board and, therefore, fall within Section 102(b)(1).  *ATP* supports, rather than undermines, this conclusion.  Third, the argument that *ATP*'s holding encompasses only state law fiduciary duty claims ignores the significance in that case of the federal antitrust claims as evidenced by this Court's repeated mention of those claims, and this Court's repeated use of the phrase "intra-corporate litigation," as opposed to the phrase, "internal affairs" claims.[92]  At a minimum, this Court did not distinguish between the validity of the bylaw's application to the state law fiduciary claims and the federal antitrust claims.

*2.  The Trial Court Improperly Restricted the Scope of Section 102(b)(1)*

The Court of Chancery narrowly interpreted *ATP* by concluding that "intra-corporate litigation" was synonymous with only the state law fiduciary duty claims.[93]  The

---

[91] *See Malone*, 722 A.2d at 12.

[92] Moreover, we think it is more likely that the "novelty" of the issue perceived by the federal court seeking certification (and by this Court in accepting certification) involved the question of whether a Delaware charter or bylaw provision could properly address an intra-corporate claim (*e.g.*, a federal antitrust claim) that was not an "internal affairs" claim.

[93] This is evident from the following passage in the Opinion below, explaining this Court's holding in *ATP*:

> Although the plaintiffs in the underlying action also asserted claims for antitrust violations, tortious interference, and conversion, the Delaware Supreme Court interpreted the certified question as only asking about the validity of the bylaw for purposes of "intra-corporate litigation."  The Delaware Supreme Court then held that the bylaw was facially valid because it "allocate[d] risk among parties in intra-

28

court then relied primarily on *Boilermakers* to suggest that *Boilermakers* defined the permissible limits of Section 109(b) and confined it to only the "internal affairs" claims that were the subject of the bylaw at issue there. In eliminating the potentially broader reach of "internal" or "intra-corporate" claims (as evidenced by our holding in *ATP*), it basically stated that everything other than an "internal affairs" claim was "external" and, therefore, not the proper subject of a bylaw or charter provision.

To elaborate, the court below reasoned that, "[t]he *Boilermakers* distinction between internal and external claims answers whether a forum-selection provision can govern claims under the 1933 Act."[94] The court stated that, "a 1933 Act claim is external to the corporation,"[95] and then explained what it meant by an "external" claim:

> Federal law creates the claim, defines the elements of the claim, and specifies who can be a plaintiff or defendant. The 1933 Act establishes a statutory regime that applies when a particular type of property—securities—is offered for sale in particular scenarios that the federal government has chosen to regulate. The cause of action belongs to a purchaser of a security, and it arises out of an offer or sale. The defined term "security" encompasses a wide range of financial products. Shares of stock are just one of many types of securities, and shares in a Delaware corporation are just one subtype. A claim under the 1933 Act does not turn on the rights, powers, or preferences of the shares, language in the corporation's charter or bylaws, a provision in the DGCL, or the equitable relationships that flow from the internal structure

---

corporate litigation . . . ." The Delaware Supreme Court did not suggest that the corporate contract can be used to regulate other types of claims.

*Opinion*, 2018 WL 6719718, at *13. But, there is nothing that suggests this Court narrowed its focus so as to mean that "intra-corporate" litigation referred only to the state law fiduciary duty claims.

[94] *Id.* at *1.

[95] *Id.*

of the corporation. Under *Boilermakers*, a 1933 Act claim is distinct from "internal affairs claims brought by stockholders *qua* stockholders."[96]

This result, it said, "derives from first principles."[97]

But *Boilermakers*' holding does not address external claims. Further, the dicta in *Boilermakers* regarding "external" claims suggests that its definition of "external" claims would exclude "intra-corporate" claims which, as explained above, do fall within Section 102(b)(1)'s broad scope. The two examples of external claims given in *Boilermakers* do not relate to the "affairs" of the corporation or the "powers" of its constituents (a tort claim for personal injury suffered by the plaintiff on the premises of the company or a contract claim involving a commercial contract).[98] As for these types of claims, no Board action is present as it necessarily is in Section 11 claims, and those claims are unrelated to the corporation-stockholder relationship. And in any event, the FFPs are limited to 1933 Act claims. Thus, FFPs are not "external," and *Boilermakers* does not suggest that they are.

But by creating a binary world of only "internal affairs" claims and "external" claims, the Court of Chancery superimposed the "internal affairs" doctrine onto and narrowed the scope of Section 102(b)(1)—contrary to its plain language. It then concluded that Delaware corporations cannot regulate "external" claims that arise under the laws of other jurisdictions.[99] If our General Assembly wishes to narrow the scope of Section

---

[96] *Id.*

[97] *Id.* at *2.

[98] *See* 73 A.3d at 952.

[99] Commentators also have viewed the choice as a binary one. *See*, *e.g.*, Mohsen Manesh, *The Contested Edges of Internal Affairs*, 87 Tenn. L. Rev. (forthcoming 2020) (manuscript at 48) (available at https://dx.doi.org/10.2139/ssrn.3435165) ("Delaware has much staked on the basic

30

102(b)(1) to be aligned perfectly with the boundaries of the internal affairs doctrine, it could do so. But until then, it is the obligation of our courts to construe the plain language of the statute.[100]

There is a category of matters that is situated on a continuum between the *Boilermakers* definition of "internal affairs" and its description of purely "external" claims. *ATP* suggests that certificate of incorporation provisions governing certain types of "intra-corporate" claims that are not strictly within *Boilermakers'* "internal affairs," can be within the boundaries of the DGCL, and specifically Section 102(b)(1). And because we are dealing here with a facial challenge, it is possible to have a scenario where an FFP could apply to an intra-corporate claim. For example, existing stockholders could assert that a prospectus relating to shares of stock the directors were selling in a registered offering, signed by the directors of a Delaware corporation, contained material misstatements and omissions. That is enough to survive a facial challenge.

### 3. The Trial Court Also Narrowed the Definition of "Internal Affairs"

The Court of Chancery not only narrowed the scope of Section 102(b)(1), but it also narrowed the definition of "internal affairs" from both the established definition in the

---

distinction that the [internal affairs] doctrine makes—the distinction between internal corporate affairs versus external matters."); *see also id.* at 54 ("So again, which is it? Are the rights of shareholders arising under federal securities law—rights that arise upon the purchase or sale of a corporation's shares—an internal corporate affair or an external matter?").

[100] *See In re Adoption of Swanson*, 623 A.2d 1095, 1099 (Del. 1993) ("We have long held that our courts do not sit as a superlegislature to eviscerate proper legislative enactments." (citation omitted)).

United States Supreme Court's decision in *Edgar v. MITE Corp.*[101] (which *Boilermakers* follows) and this Court's parallel definition in *McDermott v. Lewis*.[102]  The following illustrates the point:

**Table 1—Internal Affairs Definitions:**

| *Edgar v. MITE Corp.* | *McDermott v. Lewis* | *Sciabacucchi v. Salzberg* |
|---|---|---|
| "The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—*matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders*—because otherwise a corporation could be faced with conflicting demands."[103] | "Internal corporate affairs involve those matters which are peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders."[104] | "A claim under the 1933 Act does not turn on the rights, powers, or preferences of the shares, language in the corporation's charter or bylaws, a provision in the DGCL, or the equitable relationships that flow from the internal structure of the corporation."[105] |

---

[101] 457 U.S. 624 (1982).

[102] 531 A.2d 206 (Del. 1987).

[103] 457 U.S. at 645 (citing Restatement (Second) of Conflict of Laws § 302, Comment *b*, pp. 307–08 (1971)).

[104] 531 A.2d at 214 (citing *Edgar*, 457 U.S. at 645 and Restatement (Second) of Conflict of Laws § 313, Comment *a* (1971)).

[105] 2018 WL 6719718, at *1.  The court also stated:

> As the sovereign that created the entity, Delaware can use its corporate law to regulate the corporation's internal affairs.  For example, Delaware corporate law can specify the rights, powers, and privileges of a share of stock, determine who holds a corporate office, and adjudicate the fiduciary relationships that exist within the corporate form.  When doing so, Delaware deploys the corporate law to determine the parameters of the property rights that the state has chosen to create.

*Id.* at *2.

Focusing on the exact words used by the United States Supreme Court, the Delaware Supreme Court, and our General Assembly, the Court of Chancery's definition, on its face, is narrower than the traditional definition of "internal affairs" as used in *Edgar* and *McDermott*.

In *Edgar*, the United States Supreme Court reviewed a challenge to the Illinois Business Take-Over Act, which imposed certain requirements for takeover actions that were more onerous than the federal Williams Act regime. The United States Supreme Court struck down the Illinois law on Supremacy Clause and Commerce Clause grounds. It found that the Illinois law was a "direct restraint on interstate commerce and that it has a sweeping extraterritorial effect. Furthermore, if Illinois may impose such regulations, so may other States; and interstate commerce in securities transactions generated by tender offers would be thoroughly stifled."[106] It also held that the local interests that Illinois sought to protect did not outweigh the burden the law imposed on interstate commerce. The United States Supreme Court then described the internal affairs doctrine as follows:

> The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—*matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders*—because otherwise a corporation could be faced with conflicting demands.[107]

As applied to the Illinois law, the Court found that the internal affairs doctrine was "of little use to the State in this context" because "[t]ender offers contemplate transfers of stock by

[106] *Edgar*, 457 U.S. at 642.

[107] *Id.* at 645.

33

stockholders to a third party and do not themselves implicate the internal affairs of the target company."[108]  Finally, the Court noted that the Illinois law extended to non-Illinois corporations with principal places of business outside of Illinois, and "Illinois has no interest in regulating the internal affairs of foreign corporations."[109]

Five years later, in *CTS Corp. v. Dynamics Corp. of America*,[110] the United States Supreme Court stated:

> It thus is an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares.  A State has an interest in promoting stable relationships among parties involved in the corporations it charters, as well as in ensuring that investors in such corporations have an effective voice in corporate affairs.[111]

In *CTS*, the United States Supreme Court again reviewed a state takeover statute, this time belonging to the State of Indiana.  The Court ruled that this law did not violate the Commerce Clause because the limited effect the tender offer rules had on interstate commerce were outweighed by the State's interest in defining attributes of its corporations' shares and in protecting shareholders.  The Court also noted that the "free market system depends at its core upon the fact that a corporation—except in the rarest situations—is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of its incorporation."[112]

---

[108] *Id.*

[109] *Id.* at 645–46.

[110] 481 U.S. 69 (1987).

[111] *Id.* at 91.

[112] *Id.* at 90.

In *McDermott v. Lewis*,[113] this Court agreed with the scope of internal affairs established by the United States Supreme Court:

> Internal corporate affairs involve those matters which are *peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders.* It is essential to distinguish between acts which can be performed by both corporations and individuals, and those activities which are peculiar to the corporate entity.[114]

As explained by this Court in *McDermott*, "[c]orporations and individuals alike enter into contracts, commit torts, and deal in personal and real property."[115] As to these types of matters, "[c]hoice of law decisions relating to such corporate activities are usually determined after consideration of the facts of each transaction."[116] The choice of law determination often turns on whether the corporation had sufficient contacts with the forum state in order to satisfy the constitutional requirements of due process. But, "[t]he internal affairs doctrine has no applicability in these situations."[117] "Rather, this doctrine governs the choice of law determinations involving matters *peculiar* to corporations, that is, those

---

[113] 531 A.2d 206.

[114] *Id.* at 214 (citing *Edgar*, 457 U.S. at 645 and Restatement (Second) of Conflict of Laws § 313, Comment *a* (1971)); *see also VantagePoint Venture P'rs 1996 v. Examen, Inc.,* 871 A.2d 1108, 1113 (Del. 2005) ("The internal affairs doctrine applies to those matters that pertain to the relationships among or between the corporation and its officers, directors, and shareholders."); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1082 (Del. 2011).

[115] *McDermott*, 531 A.2d at 214. These types of matters are clearly "external."

[116] *Id.* at 214–15 (citing Reese and Kaufman, *The Law Governing Corporate Affairs: Choice of Law and the Impact of Full Faith and Credit*, 58 Colum. L. Rev. 1118, 1121 (1958)).

[117] *Id.* at 215.

activities concerning the relationships *inter se* of the corporation, its directors, officers and shareholders."[118]

The Court in *McDermott* observed that, under Delaware conflict of law principles and the United States Constitution, there are appropriate circumstances which mandate application of the internal affairs doctrine. It held that Delaware's well-established conflict of laws principles required that the laws of the jurisdiction of incorporation (the Republic of Panama) govern the dispute involving the Panamanian corporation's voting rights. It then explained that, "[t]he traditional conflicts rule developed by courts has been that internal corporate relationships are governed by the laws of the forum of incorporation."[119] We stated that, "[t]he internal affairs doctrine requires that the law of the state of incorporation should determine issues relating to internal corporate affairs."[120]

The *McDermott* decision rejected the notion that the more flexible Restatement approach of "weighing" various interests should apply to internal affairs matters. It observed that, following a California state court case in 1961 where a California court upheld an order of the California Commissioner of Corporations directing a Delaware corporation having major contacts with California to follow the cumulative voting requirements imposed by California law, commentators had suggested a "conflicts revolution" had started. The Court, citing the Restatement (Second) of Conflicts of Laws, §§ 302–06, 09 (1971), observed that the "new" conflicts theory "weighs the interests and

---

[118] *Id.*

[119] *Id*.

[120] *Id*.

policies of the forum state in determining whether the law of the forum—lex fori—should be applied."[121] But in rejecting the idea that this "new theory" should apply to internal affairs matters, this Court noted that, in reviewing cases over the prior twenty-six years, in all but a few, the law of the state of incorporation had been applied. Citing a 1968 article, this Court stated that the following statement had remained "apt:"

> The umbilical tie of the foreign corporation to the state of its charter is usually still religiously regarded as conclusive in determining the law to be applied in *intracorporate disputes*. The fundamental reexamination of the nature of conflict of laws over the past few years has virtually left foreign corporation matters remaining as a pocket of the past in a subject area which has otherwise been characterized by free inquiry, change and flux.[122]

It then stated that the policy underlying the internal affairs doctrine "is an important one," and it declined to "erode the principle" by applying the Restatement's policy of weighing the interests and policies of the forum state. Instead, "[g]iven the significance of these considerations, application of the internal affairs doctrine is not merely a principle of conflicts law."[123] Rather, "[i]t is also one of serious constitutional proportions—under due process, the commerce clause and the full faith and credit clause—so that the law of one state governs the relationships of a corporation to its stockholders, directors and officers in matters of internal corporate governance."[124] Thus, we concluded that "the application of

---

[121] *Id.*

[122] *Id.* at 216 (citing Kaplan, *Foreign Corporations and Local Corporate Policy,* 21 Vand. L. Rev. 433, 464 (1968)) (emphasis added).

[123] *Id.*

[124] *Id.* "If the doctrine is only a choice-of-law rule, then any state is free to adopt or reject it." Hon. Jack Jacobs, *The Reach of State Corporate Law Beyond State Borders*, 84 N.Y.U. L. Rev. 1149, 1164 (2009).

the internal affairs doctrine is mandated by constitutional principles, except in 'the rarest situations,'"[125] and that the alternatives present "almost intolerable consequences to the corporate enterprise and its managers."[126]

### C. Section 102(b)(1) is More Expansive than Section 115's Definition of Internal Corporate Claims

As explained above, trial court erred in narrowing Section 102(b)(1) in a manner that prohibits FFPs. In addition to the statutory construction points above, other aspects of our statutory scheme show that Section 102(b)(1) is unquestionably broader than, and is not circumscribed by, Section 115's definition of "internal corporate claims." This is supported by the fact that other sections of the DGCL have an impact on conduct with persons who are not yet stockholders, such as Section 202 ("Restrictions on Transfer and Ownership of Securities").[127] Section 202(a) provides that transfer restrictions in a stock certificate "may be enforced against the holder of the restricted security or securities or any successor or transferee of the holder."[128] Section 202(b) authorizes charter provisions that place "[a] restriction on the transfer or registration of transfer securities of a corporation,

---

[125] *McDermott*, 531 A.2d at 217.

[126] *Id.* at 216. *See also VantagePoint*, 871 A.2d at 1112 ("The internal affairs doctrine is a long-standing choice of law principle which recognizes that only one state should have the authority to regulate a corporation's internal affairs—the state of incorporation.").

[127] 8 *Del. C.* § 202. *See also* 8 *Del. C.* § 152 (regulating the form of payment of stock subscriptions); 8 *Del. C.* § 157 (authorizing provisions governing the rights and options to acquire stock). Further, DGCL Section 166, addressing stock subscriptions, provides that a "subscription for stock of a corporation . . . shall not be enforceable against a subscriber, unless in writing and signed by the subscriber or by such subscriber's agent." 8 *Del. C.* § 166.

[128] 8 *Del. C.* § 202(a).

or on the amount of a corporation's securities that may be owned by any person or group of persons."[129]

Moreover, although it is clear that various provisions of our DGCL regulate certain transactions by which one can become a stockholder, it is arguable, from a plain reading of Section 115, that, in certain instances, claims arising from the purchase of stock could be an "internal corporate claim." For example, we observe that Section 111 was amended in 2003 to empower the Court of Chancery to interpret, apply, enforce or determine the validity of agreements pertaining to sales of stock by the corporation.[130] The Court of Chancery's jurisdiction was expanded again in 2016 to include stock purchase agreements whereby one or more stockholders of the corporation sells or offers to sell their stock, and

---

[129] 8 *Del. C.* § 202(b).

[130] Section 111 was amended and restated in 2003. The 2003 version stated:

> (a) Any civil action to interpret, apply, enforce, or determine the validity of the provisions of . . . (2) any instrument, document or agreement by which a corporation creates or sells, or offers to create or sell, any of its stock, or any rights or options respecting its stock . . . [m]ay be brought in the Court of Chancery, except to the extent that a statute confers exclusive jurisdiction on a court, agency, or tribunal other than the Court of Chancery.

8 *Del. C.* § 111 (2003); Del. S.B. 127 syn., 142nd Gen. Assem. (2003). This revision covers instruments, documents, or agreements pertaining to sales of stock by the issuing corporation, including offering materials and purchase agreements, and thus could include persons who are not yet stockholders. *See* Lewis S. Black, Jr. & Frederick H. Alexander, *Analysis of the 2003 Amendments to the Delaware General Corporation Law* 4 (2003) (noting that, "[a]s revised, Section 111 goes well beyond covering actions involving charters and bylaws, and provides that actions involving documents concerning the sale of stock, restrictions on transfer, proxy relationships, voting trusts, mergers, conversions, domestications, and instruments required by any provision of the General Corporation Law, as well as any action to interpret, apply or enforce any provision of the statute, may be brought in [the] Court of Chancery"). The 2003 jurisdictional expansion predates *Boilermakers*, issued by the Court of Chancery in 2013, and Section 115, which was added to the DGCL in 2015. The General Assembly is presumed to be aware of the statutory scheme. *Hudson Farms, Inc. v. McGrellis*, 620 A.2d 215, 218 (Del. 1993) (stating that, "it is presumed that the General Assembly is aware of existing law when it acts").

to which the stockholder or holders and the corporation are parties. [131] Section 115 includes

within its definition of "internal corporate claims," claims "as to which this title confers

jurisdiction upon the Court of Chancery."[132] Accordingly, that language, on its face, could

include claims arising under Title 8 involving transactions with persons who are not yet

stockholders, but who are parties to a stock purchase agreement where jurisdiction is based

upon Section 111.

The trial court's main argument for deeming Section 11 claims to be "external" is

that they arise from the purchase of shares, as opposed to share ownership. First, that is

not necessarily the case.[133] Second, it does not matter as an FFP can survive a facial

challenge based upon claims asserted by existing stockholders. Third, as shown above, our

DGCL addresses a number of situations involving the purchase or transfer of shares. FFPs

regulating the fora for Section 11 claims involving at least existing stockholders are neither

"external" nor "internal affairs" claims. Rather, they are in-between in what might be

called Section 102(b)(1)'s "Outer Band," as explained below.

---

[131] Del. H.B. 371, 148th Gen. Assem. (2016). "The 2016 amendments expanded the Delaware Court of Chancery's jurisdiction under Section 111 to empower the Court to interpret, apply, enforce or determine the validity of (i) stock purchase agreements whereby one or more stockholders of the corporation sell or offer to sell their stock, and to which the stockholder or holders and the corporation are parties (i.e., stock transactions), and (ii) agreements to sell, lease or exchange the corporation's property or assets, which, by the terms of the agreement, requires that one or more of the corporation's stockholders approve of or consent to the sale, lease or exchange (i.e., asset transactions)." Jeffrey R. Wolters and James D. Honaker, *Analysis of the 2016 Amendments to the Delaware General Corporation Law* 1 (2016).

[132] 8 *Del. C.* § 115.

[133] For a thorough discussion of this point, *see* Joseph A. Grundfest, *The Limits of Delaware Corporate Law: Internal Affairs, Federal Forum Provisions, and Sciabacucchi*, 75 Bus. L. 1319 (2020).

*D. FFPs as "Outer Band" Matters—Outside "Internal Affairs," but Within Section 102(b)(1)*

The previous discussion lends to the inevitable conclusion that there is a category of matters that is situated on a continuum between the *Boilermakers* definition of "internal affairs" and its description of purely "external" claims. This conclusion logically follows from the points established thus far: (i) Section 102(b)(1)'s plain language encompasses "intra-corporate" matters that are not necessarily limited to "internal affairs;" (ii) our Delaware definition of "internal affairs" is consistent with the United States Supreme Court precedent; (iii) the Court of Chancery has narrowed our traditional definition of "internal affairs;" and (iv) there are purely "external" claims, *e.g.*, tort and commercial contract, which are clearly outside the bounds of Section 102(b)(1). These points are illustrated in Figure 1 below:

**Figure 1:**



41

Based upon our reasoning above, the universe of matters encompassed by Section 102(b)(1) is greater than the universe of internal affairs matters. This means that there is an area outside of the "internal affairs" boundary but within the Section 102(b)(1) boundary (between points B and C on Figure 1), which, for convenience, we refer to as Section 102(b)(1)'s "Outer Band." It is well-established that matters more traditionally defined as "internal affairs" or "internal corporate claims" are clearly within the protective boundaries (from points A to B) of *Edgar*, *McDermott*, and their progeny, where only one State has the authority to regulate a corporation's internal affairs—the state of incorporation. There are matters that are not "internal affairs," but are, nevertheless, "internal" or "intra-corporate" and still within the scope of Section 102(b)(1) and the "Outer Band," represented in Figure 1 between points B to C. FFPs are in this Outer Band, and are facially valid under Delaware law because they are within the statutory scope of Section 102(b)(1), as explained above.

The Court of Chancery unduly constricted the scope of "internal affairs" by using "first principles." Perhaps this was out of a concern that upholding FFPs might be viewed unfavorably by our sister states and result in jeopardizing even the *Edgar/McDermott*-protected "solid ground" represented from points A to B—the traditional "internal affairs" or "internal corporate claims" territory. But Section 102(b)(1) makes room for FFPs in the Outer Band, even if FFPs are outside the more traditional realm of "internal affairs."

It is potentially problematic for our State to have a definition of "internal affairs" that diverges from, and is narrower than, the long-established definition set forth in *Edgar/McDermott* and their progeny. Further, its narrower focus, based upon self-limiting

"first principles," could create confusion and erode the established borders of the internal affairs doctrine, inviting encroachment from other jurisdictions into matters traditionally governed by that doctrine.

### E. FFPs Survive a Facial Challenge as a Policy Matter

The FFPs survive a facial challenge as a policy matter as well. FFPs do not offend federal law and policy, nor do they offend principles of horizontal sovereignty.

### 1. FFPs Do Not Violate Federal Law or Policy

FFPs do not violate federal law or policy. We refer to *Rodriquez de Quijas v. Shearson/American Express, Inc.*,[134] where the United States Supreme Court held that federal law has no objection to provisions that preclude state litigation of Securities Act claims. Specifically, the Supreme Court upheld an arbitration provision in a brokerage firm's standard customer agreement that precluded state court litigation of Securities Act claims. In enforcing the provision, the Court described it as "in effect, a specialized kind of forum selection clause" that "should not be prohibited under the Securities Act, since they, like the provision for concurrent jurisdiction [of federal and state courts], serve to advance the objective of allowing buyers of securities a broader right to select the forum for resolving disputes, whether it be judicial or otherwise."[135] The holding in *Rodriguez* provides forceful support for the notion that FFPs do not violate federal policy by narrowing the forum alternatives available under the Securities Act.

---

[134] 490 U.S. 477 (1989).

[135] *Id.* at 482–83.

The Court of Chancery did not cite *Rodriguez*. It did address *Cyan*, but nothing in *Cyan* prohibits a forum-selection provision from designating federal court as the venue for litigating Securities Act claims.

Forum-selection provisions traditionally have been evaluated under the *Bremen/Ingres* line of cases. In *Ingres Corp. v. CA, Inc.*, this Court held that forum-selection clauses are presumptively valid and enforceable under Delaware law.[136] *Ingres* follows United States Supreme Court precedent in *M/S Bremen v. Zapata Off-Shore Co.* which requires courts to give as much effect as possible to forum-selection clauses,[137] and to "only deny enforcement of them to the limited extent necessary to avoid some fundamentally inequitable result or a result contrary to positive law."[138] It is unlikely that the Supreme Court in *Cyan* intended to limit *Rodriguez* or *Bremen* without explicitly discussing those cases.[139] Thus, we think the better view is that *Bremen* and *Rodriguez* still govern the enforcement of such provisions.

---

[136] 8 A.3d 1143, 1146 (Del. 2010).

[137] 407 U.S. 1, 15 (1972). Generally, "charter provisions are presumed to be valid," and the courts will construe them "in a manner consistent with the law rather than strike down" the provisions. *Cedarview*, 2018 WL 4057012, at *20. In *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991), the Supreme Court applied *Bremen's* presumption of validity to forum provisions continued in the fine print of cruise line tickets (which provisions were obviously not the subject of bargaining).

[138] *Boilermakers*, 73 A.3d at 949 (citing *Bremen*, 407 U.S. at 15). *See also Bremen*, 407 U.S. at 12 (holding that, "absent some compelling and countervailing reason [a forum-selection clause] should be honored by the parties and enforced by the courts").

[139] "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Appellee acknowledges that, "[t]here is no tension with the generic federal policy in favor of traditional, contractual, forum-selection clauses," and that, "[i]f sophisticated investors want to bind themselves to a federal forum by contract, they can."[140]  He further acknowledges that, "Delaware generally enforces forum-selection provisions contained in a contract."[141]  FFPs, as charter provisions, must be subjected to, and approved by a vote of the stockholders.[142]  The logic underlying the validity of traditional contractual forum-selection clauses has some force in this stockholder-approved charter context.[143]

Other United States Supreme Court and Delaware Supreme Court cases in other contexts support the position that FFPs are not violative of federal policy.  For example, in *Matsushita Electric Industrial Co. v. Epstein*,[144] the United States Supreme Court held that Delaware courts can settle claims subject to exclusive federal jurisdiction without violating federal law or policy.  Similarly, in *Nottingham Partners v. Dana*,[145] this Court held that a settlement approved by the Court of Chancery that provided for the *extinguishment* of federal claims was valid and not violative of federal jurisdiction.  If it is permissible for a

---

[140] Answering Br. at 30 n.116.

[141] *Id.* at n.117; *see also Boilermakers*, 73 A.3d at 953 ("The bylaws cannot fairly be argued to regulate a novel subject matter:  the plaintiffs ignore that, in the analogous contexts of LLC agreements and stockholder agreements, the Supreme Court and this court have held that forum-selection clauses are valid.").

[142] 8 *Del. C.* § 242(b).

[143] *See also Richards v. Lloyd's of London*, 135 F.3d 1289 (9th Cir. 1998) (applying *Bremen* analysis and holding that the anti-waiver provision of the 1933 Act did not void forum clause in international agreements).

[144] 516 U.S. 367, 377, 382 (1996).

[145] 564 A.2d 1089 (Del. 1989).

Delaware state court to settle federal claims as part of a state court settlement (resulting in the *extinguishment* of the federal claims), then it follows that a provision in a Delaware corporation's charter requiring stockholders of the corporation to litigate federal claims in federal court is not violative of federal policy.

### 2. *FFPs and Inter-State Policy*

Perhaps the most difficult aspect of this dispute is not with the facial validity of FFPs, but rather, with the "down the road" question of whether they will be respected and enforced by our sister states. If FFPs are not "internal affairs" matters within the traditional *Edgar*/*McDermott* sense, and are not "internal corporate claims" within the meaning of Section 115,[146] then does that suggest that *Edgar's* protective boundaries may not fully encompass FFPs? Assuming that may be the case, can and should FFPs, nevertheless, be enforced by corporations when plaintiffs challenge them in state court?[147] We believe the answer is "yes."

The question of enforceability is a separate, subsequent analysis that should not drive the initial facial validity inquiry. But we recognize that it is a powerful concern that has infused much of the briefing here. The fear expressed in some of the briefing is that our sister states might react negatively to what could be viewed as an out-of-our-lane power

---

[146] As stated above, we do not believe Section 11 claims come under Section 115's definition of "internal corporate claims." If they were "internal corporate claims" within the meaning of Section 115, then arguably, they would run afoul of Section 115's requirement that "no provision of the certificate of incorporation or the bylaws may prohibit bringing such claims in the courts of this State." For a different view on this point, *see* Grundfest, *supra* note 133, at 1378–79.

[147] This question was not a central focus of the briefing before us (which understandably centered on the initial question now before this Court of facial validity).

grab. Some say that this perception, in turn, could invite greater scrutiny of even the well-established and respected "internal affairs" territory. Or it could invite a move towards federalization of our corporate law. These are legitimate concerns. Delaware historically has, and should continue to be, vigilant about not stepping on the toes of our sister states or the federal government.

But there are persuasive arguments that could be made to our sister states that a provision in a Delaware corporation's certificate of incorporation requiring Section 11 claims to be brought in a federal court does not offend principles of horizontal sovereignty—just as it does not offend federal policy.

Given that FFPs are valid under Section 102(b)(1) even though they are not internal affairs matters, what is the proper framework for analyzing matters in this Outer Band? The analytical framework on each end of the continuum is fairly well-established. One commentator has described the framework for internal affairs matters, and for external matters, as follows:

> Typical choice-of-law analysis weighs various factors to determine which state has the most significant relationship to, therefore the greatest interest in regulating, the parties and matters at issue. This is the analysis most courts would apply to determine the law governing the corporation's *external* business activities, such as the corporation's relationships with its employees, contractors, suppliers, customers, and more broadly the general public.

> But with respect to *internal corporate matters*—matters involving the relationship between the corporation, its officers, directors, and shareholders—the internal affairs doctrine provides a different rule. Rather than trying to determine which state has the most significant relationship and

47

interest in regulating these parties, the doctrine focuses instead on a single, decisive factor: the corporation's state of incorporation.[148]

Although FFPs are somewhere in-between, the rules for determining the validity of forum-selection provisions in the contractual context lend themselves well to the corporate charter context in Section 102(b)(1)'s Outer Band area. This is because corporate charters are viewed as contracts among the corporation's stockholders, as we recently reiterated in *BlackRock Credit Allocation Income Trust v. Saba Capital Master Fund, Ltd.*[149]

Typically, in a contractual setting, the party seeking to avoid enforcement of a forum-selection clause bears the burden of establishing that its enforcement would be unreasonable.[150] The subsequent court faced with an enforcement decision has a number of safety valves, as our own courts have recognized. Relying on the *Bremen/Ingres* principles, this Court recently observed that forum-selection clauses are "presumptively

---

[148] Manesh, *supra* note 99, at 8–9 (emphasis added). *See also First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983) ("[T]he law of the state of incorporation normally determines issues relating to the *internal affairs* of the corporation. Application of that body of law achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation . . . . Different conflicts principles apply, however, where the rights of third parties *external* to the corporation are at issue." (first emphasis added)).

[149] 2020 WL 131370 (Del. Jan. 13, 2020) ("Because corporate charters and bylaws are contracts, our rules of contract interpretation apply.").

[150] *Ingres Corp.*, 8 A.3d at 1146 ("Forum selection [ ] clauses are presumptively valid and should be specifically enforced unless the resisting party [ ] clearly show[s] that enforcement would be unreasonable and unjust, or that the clause [is] invalid for such reasons as fraud and overreaching." (citing *Bremen*, 407 U.S. at 15)); *see also Bonnano v. VTB Hldgs., Inc.*, 2016 WL 614412, at *9 (Del. Ch. Feb. 8, 2016) (finding that under New York law, though forum-selection clauses are presumed valid, the court may refuse to enforce it if the challenging party can show cause); *Drulias v. 1st Century Bancshares, Inc.*, 30 Cal. App. 5th 696, 703 (Cal. Ct. App. 2018) ("Ordinarily, the party seeking to avoid enforcement of a forum selection clause bears the 'burden of establishing that [its] enforcement . . . would be unreasonable.'" (citation omitted)).

valid."[151]  Given that we are addressing a facial challenge, we are not considering hypothetical, contextual situations regarding the adoption or application of FFPs.  Such "as applied" challenges are an important safety valve in the enforcement context.   As emphasized in *ATP*, whether the specific charter provision is enforceable "depends on the manner in which it was adopted and the circumstances under which it [is] invoked."[152]  Charter and bylaw provisions that may otherwise be facially valid will not be enforced if adopted or used for an inequitable purpose.[153]  *Bremen* identifies three bases on which forum-selection provisions might be invalidated on an "as applied" basis:  (i) they will not be enforced if doing so would be "unreasonable and unjust;" (ii) they would be invalid for reasons such as fraud or overreaching; or (iii) they could be not enforced if they "contravene[d] a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision."[154]  In this facial challenge, none of these potential "as applied" challenges are implicated.

Given that many Section 11 claims closely parallel state law breach of fiduciary duty claims, many of the same reasons requiring application of the internal affairs doctrine

[151] *Germaninvestments AG v. Allomet Corp.*, 2020 WL 414426, at * 11 n.63 (Del. Jan. 27, 2020) (citing *Ingres Corp.*, 8 A.3d at 1146); *see also Prestancia Mgmt. Grp., Inc. v. Va. Heritage Found. II LLC*, 2005 WL 1364616, at *6 n.54 (Del. Ch. May 27, 2005); *Mitek Sys., Inc. v. United Servs. Auto Ass'n*, 2012 WL 3777423 (D. Del. Aug. 30, 2012).

[152] *ATP*, 91 A.3d at 558.

[153] *Id.* (citing *Schnell v. Chris-Craft, Indus., Inc.*, 285 A.2d 437 (Del. 1971)).

[154] *Bremen*, 407 U.S. at 15.

would support the enforcement of FFPs.[155]  As this Court noted in *McDermott*[156] and *VantagePoint*,[157] the internal affairs doctrine raises important Constitutional concerns— namely, under the Fourteenth Amendment Due Process Clause, the Full Faith and Credit Clause, and the Commerce Clause.  Due Process concerns address the officers' and directors' rights "to know what law will be applied to their actions," as well as stockholders' "right to know by what standards of accountability they may hold those managing the corporation's business and affairs."[158]  As this Court stated in *McDermott*, "full faith and credit commands application of the internal affairs doctrine except in the *rare* circumstance where national policy is outweighed by a significant interest of the forum state in the corporation and its shareholders."[159]  The need for uniformity and predictability that FFPs address suggest that they fall closer to the "internal affairs" side of the spectrum, which would argue in favor of deference being given to them.

---

[155] Even if conflicts of law principles of the type typically applied to external claims were applied, these principles support the validity of FFPs.  The Restatement (Second) of Conflicts of Laws explains that the needs of predictability and uniformity of result support application of the local law of the state of incorporation.  Restatement (Second) of Conflicts of Laws § 302, cmt. e (1971). FFPs are designed to achieve such predictability and uniformity of result.  Comment (g) to Section 302 of the Restatement explains that the law of the state of incorporation is applied "almost invariably to determine issues involving matters that are peculiar to corporations."  *Id.* at cmt. g. Comment (g) further explains that many factors and the force of precedent support this result "except in the extremely rare situation where a contrary result is required by the overriding interest of another state having its rule applied."  *Id.*

[156] 531 A.2d 206.

[157] 871 A.2d 1108.

[158] *McDermott*, 531 A.2d at 216–17.

[159] *Id.* at 218.

Further, a well-developed body of law, including Commerce Clause precedent, already exists to prevent a valid state law from having extraterritorial application.[160] "The limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts. In either case, any attempt directly to assert extraterritorial jurisdiction over persons or property would offend sister states and exceed the inherent limits of the State's power."[161] But as the Court of Chancery recognized in *Boilermakers*, forum-selection provisions "are process-oriented," and are not substantive.[162] They "regulate *where* stockholders may file suit, not *whether* the stockholder may file suit or the kind of remedy that the stockholder may obtain on behalf of herself or the corporation."[163] Thus, FFPs, as procedural mechanisms, do not offend these constitutional principles.

Finally, Delaware forum provisions sanctioned by *Boilermakers*, and respected by other states in recent years, are arguably more restrictive than FFPs. That is so because they may require non-resident stockholders to litigate their internal affairs claims

---

[160] *See Singer v. Magnavox Co.*, 380 A.2d 969 (Del. 1977), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983); *see also FdG Logistics LLC v. A&R Logistics Hldgs., Inc.*, 131 A.3d 842, 846 (Del. Ch. 2016) (concluding that A&R's claim under the Delaware Securities Act failed to state a claim for relief because it had not established the requisite factual nexus between the challenged merger and Delaware to trigger application of the act, and observing that A&R's argument that the act automatically applied because of a Delaware choice-of-law provision in the merger agreement "would lead to the bizarre result of converting a blue-sky statute that the Legislature intended to regulate *intrastate* securities transactions into one that would regulate *interstate* securities transactions"). Our Court affirmed that result. *A&R Logistics Hldgs., Inc. v. FdG Logistics LLC*, 148 A.3d 1171 (Del. 2016) (Table).

[161] *Edgar*, 457 U.S. at 643 (citation and internal quotation marks omitted).

[162] 73 A.3d at 951.

[163] *Id.* at 951–52; *see also Rodriguez*, 490 U.S. at 482 (finding that the arbitration clause is a procedural provision, and that there is "no sound basis" for construing a prohibition on waiving compliance with any provision of the 1933 Act to apply to the arbitration clause).

51

exclusively in Delaware—potentially far from their geographic home-base. By contrast, FFPs require that non-residents bring Section 11 claims in federal court (which could be in their home state).

In sum, FFPs, as a facial matter, do not violate principles of horizontal sovereignty.

*F. The Fee Award*

In view of our decision above, we reverse the fee award.

*IV. Conclusion*

FFPs are a relatively recent phenomenon designed to address the post-*Cyan* difficulties presented by multi-forum litigation of Securities Act claims. The policies underlying the DGCL include certainty and predictability,[164] uniformity,[165] and prompt judicial resolution to corporate disputes.[166] Our law strives to enhance flexibility in order to engage in private ordering, and to defer to case-by-case law development. Delaware courts attempt "to achieve judicial economy and avoid duplicative efforts among courts in resolving disputes."[167] FFPs advance these goals.

Our General Assembly has also recognized the need to maintain balance, efficiency, fairness, and predictability in protecting the legitimate interests of all stakeholders, and to ensure that the laws do not impose unnecessary costs on Delaware entities.[168] FFPs do not

---

[164] *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 159 (Del. 1996).

[165] *Carvel v. Andreas Hldgs. Corp.*, 698 A.2d 375, 379 (Del. Ch. 1995).

[166] *Id.*

[167] *Cantor Fitzgerald v. Chandler*, 1999 WL 1022065, at *4 (Del. Ch. Oct. 14, 1999).

[168] *See, e.g.,* Del. S.J. Res. 12, 147th Gen. Assem. (2014).

violate that sense of balance as they allow for litigation of federal Securities Act claims in a federal court of plaintiff's choosing, but also allow for consolidation and coordination of such claims to avoid inefficiencies and unnecessary costs.[169]

Finally, our DGCL was intended to provide directors and stockholders with flexibility and wide discretion for private ordering and adaptation to new situations.[170] "[T]hat a board's action might involve a new use of plain statutory authority does not make it invalid under our law, and the boards of Delaware corporations have the flexibility to respond to changing dynamics in ways that are authorized by our statutory law."[171]

For the reasons set forth above, we **REVERSE** the decision of the Court of Chancery.

---

[169] Much of the opposition to FFPs seems to be based upon a concern that if upheld, the "next move" might be forum provisions that require arbitration of internal corporate claims. Such provisions, at least from our state law perspective, would violate Section 115 which provides that, "no provision of the certificate of incorporation or the bylaws may prohibit bringing such claims in the courts of this state." 8 *Del. C.* §115; *see* Del. S.B. 75 syn. ("Section 115 does not address the validity of a provision of the certificate of incorporation or bylaws that selects a forum other than the Delaware courts as an additional forum in which internal corporate claims may be brought, but it invalidates such a provision selecting the courts in a different State, *or an arbitral forum*, if it would preclude litigating such claims in the Delaware courts." (emphasis added)).

[170] *See, e.g., Jones Apparel,* 883 A.2d at 845 ("[Delaware corporations have] the broadest grant of power in the English-speaking world to establish the most appropriate internal organization and structure for the enterprise.").

[171] *Boilermakers*, 73 A.3d at 953. "[O]ur corporate law is not static. It must grow and develop in response to, indeed in anticipation of, evolving concepts and needs. Merely because the [DGCL] is silent as to a specific matter does not mean that it is prohibited." *Id.*